# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-99-00860-CR
===============

### Justin Rynell Young, Appellant

### v.

### The State of Texas, Appellee

=====================================================================
## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
## NO. 0990568, HONORABLE BOB PERKINS, JUDGE PRESIDING
=====================================================================

Appellant Justin Rynell Young was indicted for capital murder while in the course of committing and attempting to commit the offense of robbery of Krystle Diane Davis. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West 1994). The jury found appellant guilty of the lesser-included first degree felony offense of aggravated robbery[1] and assessed his punishment at sixty years' imprisonment. The jury further found that appellant knew that a deadly weapon, a baseball bat, would be used in the commission of "this offense."

### Point of Error

Appellant advances a single point of error: "The jury's verdict and the court's judgment are not sufficiently supported by the facts and are clearly wrong and manifestly unjust."

---

[1] *See* Tex. Penal Code Ann. § 29.03 (West 1994).

Appellant is obviously challenging the factual sufficiency of the evidence to support his conviction. We will affirm.

**Factual Sufficiency**

A review of the factual sufficiency of the evidence begins with the presumption that the evidence is *legally* sufficient to support the judgment of conviction. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In a challenge to the *factual* sufficiency of the evidence, we view the evidence without the prism of "in the light most favorable to the prosecution" as in legal sufficiency challenges. *See id.*, 922 S.W.2d at 129; *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd untimely filed). A reviewing court must consider all the evidence impartially comparing evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or those facts. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). The verdict is to be set aside only when the factual finding is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *See Clewis*, 922 S.W.2d at 129. In the factual sufficiency analysis, it must be remembered that the trier of fact is the sole judge of the weight and credibility of the testimony. *See Santellan*, 939 S.W.2d at 164. Appellate courts should be on guard not to substitute their own judgment in these matters for that of the trier of fact. *See id*. The reviewing court's evaluation should not substantially intrude upon this fact finder's role. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *see also Johnson v. State*, 23 S.W.3d 1, 8-9 (Tex. Crim. App. 2000). A decision is not manifestly unjust merely because the jury resolved conflicting views of the evidence in favor of the State. *See Cain v. State*, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997).

**Facts**

On the morning of January 29, 1999, the body of Krystle Diane Davis, age 21, was found in the lounge of the Mystique Modeling Studio in Austin. Davis, a model at the studio, had been bludgeoned to death. The cause of death was blunt-force trauma to the head with a blunt cylindrical object such as a baseball bat. Two of the three blows to the head would have been fatal independent of the other blows according to the medical examiner who performed the autopsy.

Maria Hardy, another model, found the body about 10:00 a.m. when she arrived for work and turned on the lights in the lounge. Hardy saw Davis on a couch with blood on her chest and "holes all over her head." Davis's purse was by the couch. It was wide open and full of money. There was also money on the floor.

Debra Holland, the owner/manager of the Mystique Modeling Studio, testified that it was an adult entertainment business offering nude and lingerie modeling. Holland was in the studio when the body was discovered. Holland had gone to dinner the evening before and returned to the studio's parking lot about 1:00 a.m. on January 29, 1999. She stayed in her automobile because she had been drinking wine. She did not want to violate her own strict rule prohibiting individuals in the studio who had consumed alcoholic beverages. She fell asleep. Holland was disturbed by the noise of another car on the parking lot about 5:00 a.m. and entered the studio shortly thereafter. She had not turned on the lights in the lounge and did not see Davis until Hardy notified her.

Holland reported that Davis and Cher Lowe, appellant's live-in girlfriend, had worked on the evening of January 28th and the morning of January 29th. During this time period, there were only two "shows" performed, both by Davis. The record also reflects that Davis moonlighted that night with an escort agency and did two "outcalls" at $150 each. Cher Lowe made no money that

3

evening. Models Hardy and Mary Ann Piche testified that Davis was a petite, beautiful girl with large breasts. She frequently took customers away from Lowe. Apparently there was some animosity between Davis and Lowe because Lowe had supposedly slept with Davis's husband or ex-husband. Davis always carried large sums of money in her purse. It was generally known that Davis planned to spend that particular week-end at the studio.

In the early morning hours of January 29th, Davis, Lowe and Piche watched the movie, "The Texas Chainsaw Massacre." Later, about 4:30 a.m., Piche agreed to take Lowe home. Davis was asleep at this time. When leaving, Lowe took the VCR and movies, and turned off the hallway lights. The light switch had been taped to prevent the lights from being turned off because of the security video camera. Piche turned the lights back on. In the parking lot, Lowe knocked on the window of Hollard's car, stood there a while and then announced to Piche that Holland was drunk and asleep in her car. Piche drove Lowe home.

Home was the apartment of Melinda Simpson, apartment manager of the Highland Cove Apartments in Austin. Simpson lived there with her boyfriend, Chad Thatcher. Appellant was unemployed and Lowe was not making much money. They had been evicted from their apartment. Simpson allowed them to stay in her apartment and sleep on the living room floor.

The twenty-three-year-old Cher Lowe was a witness for the prosecution. She was an accomplice witness as a matter of law. Lowe had entered a plea of guilty to the murder of Krystal Diane Davis and had been given a life sentence. She related that she had not been offered any leniency to testify. Lowe admitted that she had killed Davis with a baseball bat.

Cher Lowe testified that she had known appellant Justin Young about six years and, though not married, they had lived together for several years. At the time of the offense, both she

4

and appellant were on probation for burglary. Lowe acknowledged that she and appellant had discussed a robbery of her co-workers at the Mystique Studio because the safe at the studio was bolted to "the ground." Lowe went to work on the evening of January 28th. She testified that later when appellant brought her Simpson's VCR and two movie cassettes at work, he was accompanied by his friend, Clifton Harris, and Harris's friend, a man named Israel; that at appellant's suggestion, a robbery at the studio was then discussed with the other two men, but it was realized that the girls at the studio knew appellant; that later the three men returned in the early morning hours to take Lowe to a store; that the robbery was again discussed but it was decided that the robbery would occur "after work" and that the robbery would be executed only by Lowe and appellant.

Lowe revealed that when she arrived at the Simpson apartment after 4:30 a.m., appellant grabbed the keys on a table to one of Simpson's cars and drove her back to the Mystique Studio. The purpose was to sneak in and steal Davis's money, to rob her. Lowe made clear that appellant was aware of the plan, although they did not contemplate murder. Lowe was dressed in black pants and a gray sweatshirt with a hood to hide her features from the security video camera. She wore appellant's tennis shoes with socks on her hands. She tried to walk like a man. Lowe revealed that she entered the studio with her key, went to the lounge, turned the lights on briefly, and determined that Davis was still sleeping soundly. She went to the bathroom and came back into the lounge when the telephone began to ring. Lowe turned the "ringer" off on the phone, but noticed that Davis began to stir. Lowe then obtained a baseball bat kept at the studio for the protection of the models. When Davis began to move, Lowe began hitting Davis with the baseball bat. When Lowe saw blood on her sweatshirt, she "freaked." She left the studio with the bat but without taking any money. Appellant was waiting for her in a parking lot separated by a fence from the studio's parking

5

lot where Holland's car remained. When they returned home, appellant took the baseball bat and threw it in a nearby dumpster.

Melanie Simpson, her boyfriend, Chad Thatcher, Clifton Harris, several police officers, and the medical examiner all testified for the prosecution.

Appellant testified in his own behalf, denying any guilty participation in the offense, or any robbery or attempted robbery. Appellant related that he had been out until the early morning hours with Harris and Israel but came home and went to sleep. Appellant stated that Lowe awakened him about 4:30 a.m. and insisted that he drive her to the studio; that he assumed that Lowe had left Simpson's VCR at the Mystique Studio and wanted to retrieve it. Appellant recalled that Lowe went upstairs and came back with the keys to Simpson's car that Thatcher normally drove. He did not notice that Lowe was unusually dressed, or that she had socks on her hands, or that she was wearing his shoes. Appellant drove Lowe to the studio and then drove around the block twice. Holland had warned him not to come to the studio, so when he saw Holland's car, he did not stop on the parking lot. When Lowe came out of the studio, appellant observed that Lowe was "walking frantically" and was holding something at her side which she placed in the back seat of the car. Appellant did not see what it was. On the way home, Lowe told appellant that she thought she had killed Davis. Appellant did not believe her. Upon arriving at Simpson's apartment, Lowe put a baseball bat in the apartment dumpster. Appellant went to bed. Appellant testified that Lowe never told him that she intended to rob Davis; if he had known that he was taking Lowe to commit a crime, he "would have gone in and done it with her."

Appellant admitted that on January 28th he had a conversation with Lowe, Harris and an acquaintance named Israel about a robbery at the Mystique Studio to be perpetrated by the three

6

men. The robbery had been suggested by Lowe. Appellant revealed that they discussed a need for a weapon to take the money, the best time to commit the robbery, the fact that he would need a mask because he was known by the girls, and how he would cover the security camera if he was going to be involved. Appellant related that he did not know Israel very well, that his friend, Harris, was "flaky," that he had just gotten out of jail, and that he did not take the robbery discussion seriously. Appellant admitted that after the murder he did attempt to help Lowe destroy evidence including the gray sweatshirt. Further, he had searched the dumpster for the baseball bat, but found that the dumpster had been emptied.

The twenty-three-year-old appellant admitted his extensive criminal history but left the impression that he had not, in fact, been guilty of any previous offense resulting in a conviction. This opened the door to details of the prior offenses. At the time of the instant offense, appellant was on probation for burglary and unauthorized use of a motor vehicle. The burglary had been committed by appellant and Lowe. Appellant admitted that he told the investigating officer Lowe had committed the previous burglary, claiming he was merely present at the scene. With regard to the other offense, appellant stated his friend had stolen the car without his knowledge, and when the officers approached, he fled the car, leaving Lowe behind, because he had drugs on his person. Appellant acknowledged his guilt for the offense of delivery of a controlled substance, but claimed it was only "constructive delivery" although he "pocketed" the money. Appellant admitted that he had been convicted twice for assaulting Lowe and that she had been convicted once for assaulting him.

**Discussion**

In his factual sufficiency argument, appellant does not review *all* the evidence as required, but focuses solely upon the testimony of Cher Lowe which he describes as "self-

7

contradicting." Appellant argues that Lowe's testimony, which tends to prove appellant's involvement as a party, is the same evidence that tends to disprove appellant's involvement as a party.

Overlooking the presumption that the evidence is legally sufficient when a factual sufficiency challenge is made, the gist of appellant's argument is that Lowe's testimony as an accomplice witness has not been corroborated to show that appellant was a party to the robbery. Appellant, however, does not cite article 38.14[2] or discuss the corroboration test necessary under that statute. Lowe clearly testified that appellant drove her to the modeling studio knowing of the intent to steal money from Davis. Despite the earlier discussions that day about a robbery at the modeling studio, appellant denied that he knew of Lowe's intent to steal from or rob Davis. He claimed that he drove Lowe to the studio in the early morning hours thinking she possibly wanted to retrieve a VCR. Melinda Simpson and Clifton Harris both testified that after the fact appellant told them that he (appellant) knew of Lowe's intent to steal or rob. Lowe's testimony was sufficiently corroborated.

### The Correct Standard

[T]he complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.

*Johnson*, 23 S.W.3d at 11.

### Conclusion

---

[2] *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979).

Utilizing the foregoing standard, we have, in accordance with *Clewis*, examined all the evidence impartially, and giving due deference to the jury's verdict, we conclude that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's sole contention is overruled.

The judgment of conviction is affirmed.

_____
John F. Onion, Jr., Justice

_____

Before Justices B. A. Smith, Yeakel and Onion[*]

Affirmed

Filed:   October 12, 2000

Do Not Publish

[*]  Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).